S. FRANK RUGGIO, Plaintiff-Appellee, v. BURTON DITKOWSKY, Defendant-Appellant.

Second District   No. 2—85—1026

Opinion filed September 26, 1986.

Thomas M. Cannon and Lawrence M. Cooper, both of Cooper & Cooper, of Chicago, for appellant.

John N. Pieper, Aldo E. Botti, and Joseph M. Williams, all of Botti, Marinaccio, DeSalvo & Pieper, of Oak Brook, for appellee.

JUSTICE STROUSE delivered the opinion of the court:

Plaintiff, S. Frank Ruggio, brought this action for common law contribution to compel defendant, Burton Ditkowsky, as joint obligor, to contribute his share of two notes paid by plaintiff. Following a bench trial, the trial court entered judgment for plaintiff.

Both plaintiff and defendant had known and done business with Louis Patras, who was the owner of the William Tell Restaurant. Plaintiff owns an insurance brokerage, S. Frank Ruggio and Sons, Inc., which sold fire and casualty insurance to the restaurant and automobile insurance to Patras, individually. Society Linen Supply, Inc., of which defendant was the principal owner, rented linen supplies to the restaurant. Plaintiff and defendant had, at various times, loaned money to or cosigned notes with Patras to assist the restaurant or Patras, individually.

In September 1980 Patras' wife, Potoula, requested that plaintiff take over the operation and management of the restaurant during Pa-

tras' hospitalization. During the 32 days that plaintiff managed the restaurant, handling collections, payables, and deposits, the restaurant was in a chaotic condition with the payroll not met, the employees ready to leave, the purveyors unpaid, and working capital lacking. During this time defendant acted as cooperator of the business and was there daily. Defendant knew more about the business than the plaintiff and was consulted frequently. Defendant also advised plaintiff whom to pay and whom not to pay. Defendant received daily reports on the restaurant's financial status.

During this period and until January 1, 1981, three bank accounts were used for the restaurant's funds. In September all monies went through the special account of plaintiff's insurance agency until November 1980. All transactions of that account were recorded, photocopied, audited by the restaurant's bookkeeper and admitted into evidence. In October 1980 a separate restaurant account was opened solely for restaurant funds. There were four signatories on that account: plaintiff, Patoula, Patras and John Vayette, who was subsequently hired as the restaurant's operating manager. The third account was used for the proceeds of the two notes at issue.

In December 1980 the restaurant needed working capital for the upcoming holiday season. Plaintiff and defendant cosigned the two notes at issue to the First National Bank of Hinsdale (the bank), dated December 16 and December 22, 1980, for the amounts of $20,000 and $10,000, respectively. The proceeds were deposited in the William Tell escrow account at the bank. Plaintiff, Potoula, and Vayette were also signatories on that account. Defendant, although impeached by his deposition, testified that the proceeds of the loan were to be used to repay money owed to Society Linen Supply, Inc. Defendant admitted signing both notes and that he was obligated to pay half of the amount due on the notes if not paid by the restaurant.

Although plaintiff was still connected to the restaurant with the authority to authorize payment of its bills until January 1981, he ceased active management November 1, 1980. Plaintiff did not always review invoices or actions taken on behalf of the restaurant after November 1, 1980, when Vayette was managing the restaurant. Blank checks were left for Vayette to see that bills were properly paid.

Neither defendant nor Patras ever asked for an accounting from plaintiff to determine how proceeds received by the restaurant were paid out. Checks written from the separate account with the proceeds of the loans required two of the three signatures. At the end of plaintiff's involvement, the accounts were audited and reconciled by the restaurant's accountant and found to be $1,800 short, and not $18,000

short, as Patras testified. Those figures did not include overhead costs to plaintiff for his office management. Any monies paid with restaurant funds which were not restaurant expenses out of the S. Frank Ruggio account were reviewed and reconciled by the restaurant's accountant.

During trial, defendant stated that the restaurant owed his company $20,000, rather than the $9,689.88 paid. But, his deposition testimony indicated that his company was owed only about $9,500.

Around June 1980, before plaintiff and defendant cosigned the notes in issue and before plaintiff took over the temporary management of the restaurant, plaintiff cosigned one of a series of separate and distinct notes for loans to Patras. A 1978 or 1979 450 SL Mercedes Benz was to be collateral for the loans. No title was produced so Patras gave plaintiff title to a 1979 6.9 Mercedes. Plaintiff testified that Patras signed over the title so the car could be sold and proceeds applied to the note cosigned by plaintiff and Patras. Patras testified that he gave plaintiff the title upon plaintiff's representation that the car was needed as collateral for an additional loan to pay the restaurant's sales taxes and for the notes in issue cosigned by plaintiff and defendant. The obligations fell upon plaintiff, who sold the 6.9 Mercedes in mid-1981 for $28,000, using the proceeds to pay debts.

When the notes in issue were not paid, plaintiff approached defendant about payment. Defendant testified at trial that he told plaintiff the notes had been paid with money from the restaurant and the automobile plaintiff took from Patras, although his deposition stated that when plaintiff approached him, defendant was going to do absolutely nothing about payment. Defendant also testified that he knew plaintiff had paid off the loan.

While plaintiff was presenting his rebuttal, defendant's attorney, Michael K. Fawell, was suspended from the practice of law. Four months later, defendant's substitute counsel, Edward Ward, advised the trial court that his client was willing to proceed with trial rather than accept the retrial the court offered. After trial resumed with new counsel, defendant attempted to introduce into evidence documents purporting to show that the restaurant's escrow account was closed as of January 26, 1981, after $11,549.85 was charged to the account "per E.L." The trial court sustained plaintiff's objections to a lack of foundation, but allowed the proofs to remain open for two weeks giving defendant an opportunity to prove the foundation. No documents or affidavits were admitted during the allotted time. The court heard closing arguments from both sides. The trial court, in a letter opinion, stated that the reviewed documents, although not admitted, would not change the court's opinion.

On September 16, 1985, defendant filed a motion for a mistrial on the basis that new counsel was placed at a disadvantage in that he could not adequately respond to questions relating to evidence and facts prior to new counsel's representation. On September 19, 1985, the trial court entered judgment for plaintiff. The trial court denied defendant's motion for a mistrial after a hearing was held on October 1, 1985. On October 17, 1985, defendant filed a motion for reconsideration largely based on his previous motion for a mistrial. The motion was thereafter denied, and defendant filed this timely notice of appeal.

The main question before us is whether the trial court's judgment is supported by the manifest weight of the evidence. When a trial court renders judgment in a bench trial it will not be disturbed on appeal unless it is contrary to the manifest weight of the evidence. (*Schoenberger v. Chicago Transit Authority* (1980), 84 Ill. App. 3d 1132, 1136.) For a judgment to be found to be against the manifest weight of the evidence, the appellant must present evidence that is so strong and convincing as to overcome completely the evidence, and presumptions, if any, existing in the appellee's favor. (84 Ill. App. 3d 1132, 1136.) A reviewing court may not reverse a judgment merely because different conclusions could be drawn or because the reviewing court disagrees, so long as there is evidence to support the judgment. *La Grange Metal Products v. Pettibone Mulliken Corp.* (1982), 106 Ill. App. 3d 1046, 1052.

In an action for common law contribution, the right to contribution arises due to the compulsory payment by a joint obligor of more than his share of a common obligation. (*Harris v. Buder* (1945), 326 Ill. App. 471, 475-76; *Gottschalk v. Gottschalk* (1921), 222 Ill. App. 56, 59.) Before one is entitled to contribution from his coobligor, the evidence must disclose that he has paid more than his just proportion of the joint indebtedness and it must also disclose what that excess is. *Schaefer v. Dippel* (1928), 250 Ill. App. 184, 188.

Defendant initially asserts that the evidence does not support the finding that funds received by plaintiff on behalf of the restaurant were properly accounted for. By this assertion, defendant submits that plaintiff failed to prove that the payment of the notes did not come from funds provided by the operation of the restaurant as first contemplated by the parties or from the sale proceeds of the 6.9 Mercedes.

Plaintiff responds that defendant has waived his defense of payment or offset since this is an affirmative defense which defendant had the burden to raise and prove. Neither plaintiff's citations nor our own research has found authority to support this specific contention.

As to contribution between cosureties, the obligation rests on a co-

surety to account to another cosurety for his just proportion. (*Olof Johnson's Administrators v. Vaughn* (1872), 65 Ill. 425, 427.) We believe that the obligation to account to a comaker is equally applicable and, therefore, plaintiff had the burden to account to defendant. However, there are no cases cited to this court by either party that there is a fiduciary obligation to make full disclosure of every financial transaction taken on behalf of the restaurant, and we find no basis to establish such a relationship in this case.

While the parties anticipated that the payment of the notes would come from proceeds generated by the restaurant, there is evidence that the payment of the notes did not come from those. Evidence showed that the restaurant did not generate sufficient funds for such payments. There is no question that the restaurant was in a chaotic state when plaintiff took over its temporary management. All transactions were recorded, photocopied and given to the restaurant's bookkeeper. During plaintiff's management, defendant was consulted and appeared at the restaurant on a regular basis. He also received reports on the restaurant's financial status.

Defendant admitted he was comaker and a signatory on the notes with plaintiff. He admitted the notes were repaid by Ruggio. Plaintiff paid the notes with his personal check for the total outstanding obligation on both notes cosigned with defendant. Under the facts, we cannot say that the judgment is not supported by the weight of the evidence.

■ Nor can we say, based on the evidence, that plaintiff used the proceeds from the sale of the 6.9 Mercedes to pay off the notes in issue. The only collateral listed on one of the notes in issue was a certificate of deposit which was posted by plaintiff alone. Neither Patras nor defendant posted any collateral on the notes. The second note was unsecured on its face. Plaintiff testified that Patras voluntarily delivered the car's title and authorized plaintiff to sell the car to pay off the notes cosigned by plaintiff and Patras. The notes that plaintiff and Patras signed were secured by a 1979 or 1980 Mercedes. Plaintiff, in fact, testified that when the 1978 or 1979 Mercedes could not be found he applied the proceeds from the sale of the 6.9 Mercedes to pay off those notes. Furthermore, although Patras testified that he authorized plaintiff to sell the 6.9 Mercedes to pay off back taxes and the notes in issue, he admitted his prior conviction for mail fraud; shipping a Mercedes to Greece and claiming it was stolen; and a conviction for being involved in the theft of $750,000 in government tax checks. Defendant's trial testimony was also impeached.

■ We recognize that where the testimony and the evidence are conflicting, the trial judge as trier of fact is in a position superior to a

court of review to observe the conduct of the witnesses while testifying, to determine their credibility, and to weigh the evidence, and where we believe the trial court's finding is not against the manifest weight of the evidence, we will not disturb it. *In re Estate of Deskins* (1984), 128 Ill. App. 3d 942, 951; *Schoenberger v. Chicago Transit Authority* (1980), 84 Ill. App. 3d 1132, 1136.

Defendant believes that because the trial court had reviewed and concluded that certain documents would not change its opinion, the trial court did not understand the significance of the need for an accounting of the restaurant's funds. These documents, which were not admitted into evidence because of a lack of foundation, consist of two bank statements for the restaurant's account and an "advise of debit," which defendant alleges indicates that the bank charged the restaurant's account in order to close it, *per* the instructions of "E.L.," which are the initials of Edward Lynch, vice-president of the bank. Defendant also contends that if the trial court had followed its own order and withheld ruling, there would have been time to obtain Edward Lynch's affidavit or further testimony.

On the last day of trial, the trial court gave defense counsel two weeks, until September 17, to obtain a foundational affidavit for the documents. The court advised counsel it would rule on or before October 11. Judgment was rendered on September 19. No affidavits were submitted. Defendant cannot take advantage of his own failure to obtain the affidavits sought. Moreover based on the documents admitted, without any supporting affidavits, we agree with the trial court that it would not affect the outcome of the judgment.

Defendant next contends that the trial court abused its discretion in denying his motion for a mistrial. Defendant maintains he was denied a fair trial due to the failure of his original counsel in the preparation and conduct during defendant's case.

The trial court found that defendant waived his right to assert a mistrial based on inadequate representation. Although there may exist grounds for a new trial, the right of a party litigant to assert such grounds may be waived by the adoption of a position which is inconsistent with the assertion of the right to a new trial. It is also recognized that a party will be deemed to have waived matters constituting grounds for a new trial which come to his attention or knowledge during the course of trial, or of which he should, by the exercise of reasonable diligence, have acquired knowledge, where he fails to make an objection at the time and seeks to have the defect cured. 58 Am. Jur. 2d *New Trial* sec. 16, at 200 (1971).

Defendant's new counsel appeared before the trial court on Sep-

tember 3, 1985, four months after defendant's original counsel last represented defendant following his suspension from the practice of law. The court, in the presence of his client stated: "[T]he record should reflect that we had a problem during the course of this bench trial which has been somewhat elongated and that was, that Mr. Michael Fawell was suspended from the practice of law and so new counsel was obtained for [defendant] and that is Mr. Ward, and it's my understanding your client is willing to proceed as you are from where we left off in this trial, rather than start anew; correct?" Defendant's new counsel answered: "That's correct, your Honor." Defendant made no objection at that time.

Under more stringent criminal rules, a waiver by an attorney in open court with his client present is binding. (See *People v. Johnson* (1979), 75 Ill. 2d 180, 187 (defendant's conduct in continuing with retained counsel, despite being advised by the trial judge that he was receiving ineffective assistance and of the option of securing different counsel and a mistrial, was held to demonstrate a waiver); *People v. Murrell* (1975), 60 Ill. 2d 287, 290 (a defendant ordinarily speaks and acts through his attorney, who stands in the role of agent, and a defendant who permits his attorney, in his presence and without objection, to waive his right to a jury trial is deemed to have acquiesced in, and is bound by, his attorney's action).) We conclude, based on these facts, that defendant adopted a position inconsistent with his assertion for a new trial based on inadequate counsel.

It has long been the rule that the actions of an attorney in the conduct and management of a case are binding on his client. It is equally established that even negligence of counsel is insufficient to warrant a new trial. (*Laff v. John O. Butler Co.* (1978), 64 Ill. App. 3d 603, 621.) At no time during the trial did defendant indicate to the court that he felt trial counsel to be inadequate in presenting his case. Defendant's motion for a mistrial did not allege that he had a meritorious defense which was not advanced; it did little more than to allege that he was not adequately represented. We, therefore, find the trial court did not abuse its discretion in denying defendant's motion for a mistrial.

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

HOPF and SCHNAKE, JJ., concur.